Thank you. Good morning, Your Honors. My name is Knut Johnson, and I represent John Carman on this appeal. I have to say, could the facts in this case be any more fun? Yes. No. Someone needs to write a movie on this. Yeah. Well, I can tell, Your Honors, that I have never had more fun cross-examining a person than the informant in this case. It went on and on. And one of the difficulties, I think, of this appeal is that it's not a simple case. The difficulty of this appeal is that my issues are so fact-intensive. I mean, I could recite my closing argument to you again, and I don't think you want to hear it. It would take too long. So I want to, on the sufficiency argument, just highlight a few notes in the order that I hope Your Honors will consider them. And that's this, that in this case, Eloy Fernandez plays a central and very important role, obviously the most important role in the government's presentation of evidence, although the government tries to back away from Mr. Fernandez for very obvious reasons. But Mr. Fernandez is the only living witness in this case, the only person who was able to testify that I had communications with John Carman, and he was the one who testified that there was a conspiracy to kidnap, but that conspiracy began in February 2007 and not before. And that's very important. It's obviously also important that Mr. Fernandez not only had a hypothetical incentive to want to find someone and convict that person in order to come to the United States legally. He'd done that in the past. He had an expressed desire to do that to the customs officer in this case who he told her he wanted to come back and in fact Mr. Carman encouraged this informant to go talk to law enforcement, go talk to customs, and in some of the e-mails Your Honors can see he's advising Mr. Fernandez. Well, it sounds like you're arguing the informant's credibility, but the jury already found him credible. Yes. If we just say for a moment he's completely incredible, take him off the table, you can't believe a word he says, it distorts the case. Because when you look at the only real evidence against Mr. Carman, those audio tapes, the question has to be what is Mr. Fernandez saying and how is Mr. Carman responding and why is Mr. Fernandez saying the things he is. And it's our view that if he wasn't, didn't entrap Mr. Carman, the evidence is fairly clear that he was trapping him with his language in trying to create a crime that didn't exist. And even though the FBI was pushing him and saying, remember in the first two conversations, after the first two the FBI agent said, you know, to me it didn't sound like they were talking about a kidnapping. Okay. There's no contention that the jury was, no one's saying the jury was incorrectly instructed, correct? No. No claim of instructional error. No. So, and entrapment was given to the jury, correct? Correct. So I guess that's getting back to what Judge Wardlaw is saying, why aren't these really great arguments that the jury heard and just resolved against your client? Well. Because, you know, as to credibility, obviously I think any of us that have been around the block know that witnesses come in all sorts of shapes and forms, and some have rap sheets longer than the defendants do. And but a stop clock is right twice a day. So, I mean, jurors often are, you know, asked to evaluate very seedy people, and which Mr. Fernandez certainly appeared to have, you know, all of those seedy characteristics, but they still could believe him. And so, you know, I don't think there's any evidence that Mr. Fernandez is a government agent. I don't think there's any evidence that Mr. Fernandez is a government agent. Right. Which goes to the heart of the case, which is a part of my argument, which is was there a proof of an agreement between Mr. Lane and Mr. Carman? Because obviously there can't be an agreement between Mr. Carman and Mr. Fernandez. Mr. Fernandez is a government agent at the time. So is there an agreement between the two? And if there was an agreement, was the object a kidnapping? Well, okay, when you're saying, you're just saying that he's a government agent, the government, the agent wasn't claiming he's worked for the government at certain times, but the government's not of the position that he was working for the government on this, right? Well, I think that he clearly was by the time he was making the phone calls and before. He had been in the past. He was working for the government as early as October when he signed up with the customs officer as an informant. And if you'll recall, that's the customs officer who I believe Mr. Carman gave the informant the name of a customs officer he had worked with, the contact, and that person had become a supervisor and put Mr. Fernandez in touch with a special agent. Mr. Fernandez went to see this special agent or contacted her shortly after he was deported from the United States, and that was around September of 2006. And he was clearly working for her, and I believe there was even an indication that at some point, much later, he talked to her even about a potential kidnapping. And I may be misremembering that because I don't have that in front of me. But regardless, he was working for the government long before February of 2007, long before. The jury would not under the instructions have permitted, been permitted, would it, to find a conspiracy with Mr. Fernandez? No, I don't think they could have. And I think I understand part of Your Honor's argument, which is that this is a very, very fact-intensive case. And so, therefore, it's very difficult to decide, because it's all circumstantial, is, you know, what were the facts upon which the jury could find beyond a reasonable doubt that there's an agreement between Mr. Lane and Mr. Carman? And if you break it down to what are those essential facts, the government tried to do that in their brief. And they said there's a post-arrest statement, there's an e-mail from George Lane before February of 2007, and there's an e-mail to Lane from Mr. Carman after February of 2007. And what's important about that is that the government pretty effectively narrowed this huge morass of facts down to really kind of the three essential ones. And one is Mr. Carman's statement, which, of course, there has to be corroboration of the statement. And Mr. Carman says, well, Mr. Lane was the one who wanted her arrested. And he uses that word, and he even tells the agents, I thought it was a lawful arrest. I thought I was dealing with a Mexican law enforcement officer. And that's consistent with all the e-mails. The second fact were e-mails from George Lane to Mr. Carman conveying some photographs. In those before February 2007, the difficulty or the reason you can't use that to affirm the conviction is that the government's own informant says that there was no kidnapping conspiracy before February 2007. So why was Lane sending pictures of his wife to Carman? It wasn't Mr. Lane's wife. It was his ex-girlfriend. Right. Unless he wanted her to, wanted Mr. Carman to be able to identify her. But clearly he wanted her identified, and he wanted her lawfully arrested. And that's even what Mr. Fernandez says earlier on, is that he believed this, that Mr. Carman and Mr. Lane, whom he never met and never knew anything about, wanted this woman arrested because they knew she'd be traveling to Mexico and would have narcotics on her and have drugs on her. And that's consistent with every e-mail and every statement Mr. Carman makes. I mean, he is clearly obsessed and obsessive about her. And but in every instance it's about her committing a criminal act. But the importance of the date of those e-mails is before there was any, could have been a conspiracy to commit the crime in this case. And which means that to prove that there's an unlawful agreement between Mr. Lane and Mr. Carman, you have to prove it from February 2007 on. And there's just simply no evidence of it. Why do you use that date? Because that's the date the informant gave. He said there was no kidnapping. He said this started off as an agreement to lawfully arrest, and it became a kidnapping. There's no requirement in conspiracy for the word kidnap to be actually used, right? No, it doesn't have to be. And how could they, I mean, how could they legitimately, I mean, couldn't the jury have rejected the notion that they could, these private people could arrange for a lawful arrest or that they even believe that's what they were doing in light of the other conversations or e-mails about finding police outfits and, you know, reporting to arrest her under the authority of the Mexican police? If I understand Your Honor's question correctly, it's that couldn't the jurors have relied upon those conversations to decide, no, this is a conspiracy to kidnap? But the problem is those conversations occurred long after there's any discussion with Mr. Lane involved anymore. So then it's a conspiracy between Mr. Carman. If you're assuming, and I'm not, that that is evidence of guilt, that Mr. Carman, Mr. Lane, or Mr. Fernandez. Are you saying Lane dropped out? Well, I'm not conceding Mr. Lane was ever involved in a conspiracy to have someone illegally kidnapped. He wanted someone arrested. And there's nothing unlawful about if someone knew that a person was traveling to another country and would have contraband on them or would get contraband there. Well, how does that fit into the money discussion then? You mean the fact that they're talking about money? They're talking about her parents and how much money her parents have and all of that. I mean, that certainly erodes the arrest part of it. I mean, all those things are there. You order them in a certain way, but the jury's entitled to fit them into the categories as they see fit, not as you argue or as the prosecutor. No, absolutely. But when they talk about the money, remember that's Mr. Fernandez on those phone calls that's talking about a million dollars. Well, they haven't. They talk on par. Are we talking bail? Are we talking whatever? And all of that's up to dispute whether it was a ransom or whether it was bail. But obviously the jury decided they didn't decide that it was bail. They decided that it was a ransom request. Right. And I think what Your Honor is saying is very important because when you decide the sufficiency of the evidence in a conspiracy case, it's almost inevitably you're looking at circumstantial evidence. And that's where the difficulty arises because circumstantial evidence arises from facts, from the facts you can draw an inference. And from all these facts, there's alternative inferences. You know, the fact that he talks about uniforms. Well, we need uniforms. But I hate to cross-examine you, but right when you say things like from all of these facts there's alternative inferences, that right there tells me the jury can take one, you can take another, but those are all jury arguments. And if the evidence is susceptible to alternative inferences, i.e., you lose. Well, I'm not sure that's necessarily true. I do know that in – I believe that there's two alternative inferences, one that points to guilt and one that points to innocence, and they're both reasonable. But I think the jury would have to adopt the one that points to innocence. That is actually a – But that's the circumstantial evidence instruction. Right. And that when evaluating what the jury has done for sufficiency in a conspiracy case, I would suggest that's also an appropriate approach. If there's a case like this, and I don't think there will be many others coming down the road to this Court, where it's all based on three – the government case is based on three conversations that are recorded by an informant who has an incredible incentive to try to make something look like a crime, but not go so far as to alert the person that they're talking about a crime because he knows that the person thought that they were talking about a crime before, then I think you have to look at the alternative inferences and that that's only fair, and that in this case, given how incredible that informant was and the fact that the FBI has said we will never work with this person again, he just is trying to come back into this country by providing information, and he's set up law enforcement officers in the past, that given all that, you can't take that out of the mix when evaluating this and saying, well, okay, what happened in those three conversations? And I would submit that in those three conversations, it is not clear. Counsel, if I understand your argument, let's assume that there's an agreement between Carmen and Lane to have Lane's ex-girlfriend arrested, and then Carmen gets into conversations with Fernandez, and it morphs into a clear kidnapping arrangement. They're talking about money from the – has the crime of conspiracy been completed? No. Lane has to be in on it, right? Right. Lane has to be a party to it. There has to be evidence that Lane participated in the morphing of it from an arrest to a conspiracy. All right. What is the – or what's the deficiency in that? Are there communications after any of those taped discussions between Lane and Carmen? There's no evidence that Lane communicated with Carmen. There's evidence that Carmen sent Lane three e-mails asking for information, I think. That might have been only one e-mail. After February of 2007, which was after the morphing of it. It didn't Lane again send photos? Well, there's no – the government presented no evidence that Mr. Lane's computer sent any photos. And, in fact, the photo – I was just flipping through those before. At least one of the photos was a re-send of an earlier photo. Right. Well, didn't he re-send it? Well, it's not clear that he re-sent it. You can't tell. But, see, that's the government's – part of the government's failure of proof. They would have had to show, to connect that dot, that Mr. Lane's computer sent the e-mail to Mr. Carmen's computer after it morphed into a kidnapping conspiracy. All right. Can we talk about the sentencing issue? Yes, Your Honor. Well, suppose we were to conclude that the district court erred by failing to apply the sixth-level enhancement. Clearly, Apprendi isn't a valid reason not to. And it does seem that the jury necessarily must have found that there was a conspiracy to kidnap for ransom. So is your argument, or would your argument be, that it's harmless error? Well, I think it is harmless error. I think that, you know, the court did find that this was a sentencing entrapment case that – and I believe that was an express finding by Judge Hoff. I also think that, in this case, the court did have some concern, after hearing all the evidence, about whether this was a conspiracy to kidnap or a conspiracy to hold someone for bail. And this – I know we didn't talk about my void-for-vagueness arguments. I know there's a – But you're conceding that the district court misapplied Apprendi. I – yes, absolutely. She misapplied Apprendi. But I think that she's right, because in the analogy, and that's this. I don't think the jury's verdict is necessarily a finding that there was a kidnapping ransom, because the – under the vagueness argument, you'll note that one of the concerns was that the jury could have fined. And remember, the jury asked, well, what's kidnapping? But the jury had to – they had to find beyond a reasonable doubt that Carmen intended for KAM to be unlawfully seized in order to convict him. Correct. The jury had to find that, right? Correct. And that's – one of the problems is unlawfully where? Whether it was unlawful in the United States or in Mexico. And there was no government proof on that. And the other part is that it would have had to be – what if it – the jury had found, well, it was a lawful arrest in Mexico, but we don't think it's lawful to agree to have someone arrested in Mexico from the United States and held for an imparo, which is illegal in the United States but legal in Mexico. And that's the difficulty there. And I think that is – when I say that's – that Judge Huff's reasoning was – her reliance on the Supreme Court case law was incorrect, but her reasoning was correct under the guidelines because the jurors did not necessarily have to find that this was a victim being held potentially or was going to be held for an illegal ransom. It could have been for a lawful imparo. And I think that under the instructions, they could have convicted for that. And that's why I argue it's void for vagueness under the interesting and unusual facts of this case. But if it was a lawful imparo and the jury believed that, then they wouldn't have convicted him. I don't believe that's necessarily true. I mean, they didn't have his statute. It's – and the jurors were instructed that they could convict if they thought that there was – Christie was being held unlawfully seized, detained, and kidnapped and that they then came back and said, well, what's kidnapped mean? And they weren't given any further instructions on that, as I recall. And the problem is, is that even if it's for a profit and it's unlawfully seized, would it be unlawful to hold someone in the United States for an imparo? Yes. We don't have that legal mechanism. Would it be unlawful to hold someone in Mexico for an imparo? No. It's perfectly lawful under the evidence that was presented in this case. And that was developed on cross-examination of the informant. The government presented no evidence whatsoever about what was and was not lawful in Mexico in terms of holding someone in bail, et cetera. And I see that I – Your question is that the indictment charges him to commit an act outside the United States that would constitute the offense of kidnapping if committed within the United States. They were instructed that – So, I mean, this may be something you want me to say. I mean, in other words, if it's illegal to hold somebody for an imparo in the United States and keep the money, that would permit them to convict, but maybe the court could find it not to be a ransom for purposes of the enhancement. That would be correct in that it was my analysis on both the void for vagueness and the sentencing argument, Your Honor. All right. Well, thank you, counsel, for your time. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Justice King of the United States. Your Honors, I believe that most of the points that have been raised have been addressed in the government's brief, so I would like to take this chance to hone in on any particular concerns that the court might have about any particular case. Well, one I have is what evidence is there that Lane knew that this would be a kidnapping and not an arrest? Well, there was ample evidence of that. It's set out, Your Honor, in the government's brief on pages 25 to 27, and I think that what's difficult about this case is that it does require the jury to put together a lot of small bricks to build the wall that was needed to prosecute John Carman's defense. So to really tell the story about what the evidence was of the agreement, you have to look at the whole entire big picture, and that started in this case with the testimony of the victim, who we've referred to as KAM. She testified at trial that she and George Lane dated for a couple of years. Their relationship was off and on, that he told her things that were outrageous and probably not true, like he'd worked for the NSA and that he'd worked for spy agencies. They vacationed together in Mexico at the same resort where the kidnapping was to take place. He had spent a week or ten days with her vacationing there. They then had a very tumultuous breakup when the victim found out that George Lane wasn't going off to work for the CIA. He was going home to his wife. He was actually married. So that led to a big fight between the two of them, and the victim also testified at trial that subsequently she went back to that same resort, and George Lane had arranged for men to come and meet her and try to vouch for him, telling the victim that George Lane was a highly regarded secret operative and that he should be totally believed and that his marriage was a fraud, all in an attempt to get her back. Well, that then all fell apart, and he was never able to get her back, but what he did was he hired John Carman to start doing private eye work, which I think is most fairly characterized as stalking her. And if you go to the particular evidence, so with this background in mind, the particular evidence that showed that there was an agreement between Carman and Lane was that in his post-arrest statement, John Carman himself said that it was Lane's idea to have her arrested. Now, Carman said that it was an arrest, but I think all the evidence shows that it wasn't going to be an arrest. And it's clear that George Lane didn't really intend for it to be a lawful arrest because George Lane suggested that they should ask for a $1 million bail from the victim's parents. So right there is another hallmark that George Lane, as he's asking Carman to, quote, unquote, arrest her, knows that this isn't a lawful arrest because he couldn't have reasonably believed that for an arrest that's going to take place in Mexico, that he, George Lane, private citizen living in the United States, gets deceptive $1 million bail. Beyond that, I think one of the most damning pieces of evidence against George Lane is that Carman reported that Lane said that they should plant something in the room. So, of course, that's another telltale sign that Lane knew that it wasn't going to be a legitimate arrest. I suppose you can have a legitimate arrest and still plant. I don't know if I'd agree with that. I mean, if they had been dealing with a lawful- If they had other drugs. I mean, if they had a legitimate police officer in Mexico but who was corrupt and was willing to plant evidence on someone, then I think it would still be an unlawful kidnapping. And then if you look over time, you look at the photos that were sent, on January 24, 2007, Lane emailed a photo of the victim standing with the man in front of the helicopter. This was- Carman then later describes to Fernandez that that's the guy that's supposed to be down there. The appellant raises February 2007. February 2007 is an important hallmark. And this is based on the CIA's testimony that he basically first thought it was a kidnapping in February 2007. Well, the government's position on that is that Fernandez doesn't know when the plan is hatched. He's just simply saying that this is when he knows for sure that what they're not doing isn't going to be a legal arrest but it's going to be unlawful for kidnapping. So we have evidence both before and after that date that shows that it was Carman and Lane that were conspiring together. And it doesn't matter when Fernandez thought the plan came together because he didn't know. Would you talk about the sentencing error? Do you think, does the government think that this should be remanded for resentencing? That's right, Your Honor. The government's position is that it was abuse of discretion not to apply the plus six, one, because of the misapplication of a penalty which there doesn't appear to be a dispute about, but second, because what the district court did in effect was adopt the defense's theory of the case which had been rejected in not applying it. And I think if you look even beyond that, if you look at the weight of the evidence, that it was simply an abuse of discretion not to find that there was going to be a ransom demand made because it was the sole motivation for Carman participating in the defense. And beyond that, Carman had taken specific acts to instruct Fernandez on how the ransom should be used. So you're asking us to say it currently doesn't apply, but then are you asking us also to make the finding that? What the government would ask would be that the court remand the case with an instruction to the district court to apply the plus six. Now, we could do that. I mean, if we think that there was procedural error in the calculation of the guideline, that if Judge Huff, for whatever reason, thinks this was sentencing entrapment or whatever, she could still sentence him to the same sentence under the 3553A factors, right? I think that's possible. In the government's view, doing so wouldn't, you know, wouldn't give the due weight to the guidelines. While the guidelines are just a factor, if the court determines, well, the plus six. Right. That would be another appeal. It would be another appeal. But as to the harmless, I do want to point out one thing, and that is that after Carman was convicted, the district court on her own suggested that Carman should possibly be released on bail pending appeal. So the government vigorously opposed it, and there's a general rule that favors detention pending appeal in crimes involving violence. Now, at that hearing that we had on that matter, one of the issues was, well, let me state it differently. There's a limited exception that even in cases where there's a crime of violence, that in an extreme case the person might be put out on appeal if there's some novel legal issue. So one of the factors is, well, maybe the statute for a maximum penalty is life, which suggests it's a very serious offense, but the person got a very low sentence. So in evaluating that fact, Judge Huff said, well, yes, it's true that he only got 60 months, but the government might have a good issue on appeal. I don't know that she finished the sentence, but the implication was that it might result in him getting a longer term. So the fact that he initially got 60 months, she discounted that somewhat when deciding whether or not to let Carman out on appeal. So that's a suggestion to me that she might consider a higher sentence. So 60 months was a downward departure from the guideline range, wasn't it? Yeah, there were a number of departures. And, you know, back when just after Booker, we remanded a lot of cases saying the district court thought the guidelines were mandatory. They aren't there. They're just advisory. And we're sending this back in the district court can determine whether with that knowledge it would have made a different sentence. Now, could could we remand to the district court saying the district court is should look at this? It miscalculated the the enhancement when it calculated the guideline range. And unless the district court decides that she would give the same sentence, she has to order resentencing. I'm not sure. I mean, you know, in the government's view that the government ought to have a be entitled to a fresh hearing in which we can argue that that when the calculations are. Well, in Booker, they had to get the views of both sides before. Yeah. It ought to be aired out again because the question of whether it was a reasonable sentence then can't be determined if the starting point is incorrect. So the government believes that if the court agrees that it was an error, that the court should at a minimum order a hearing for the court to reconsider its sentence. And we would ask that the. Well, I guess monster resentencing. Maybe. Is Mr. Carman out on bail? No, the court ultimately denied the motion because at the time that the court had raised it, I don't believe that she was aware of the principle that for convictions such as kidnapping, that there's a presumption in favor of detention pending appeal. So she had raised it on her own, but then decided against it ultimately. And was Mr. Lane tried and convicted too? He was put out on bond and he was arrested a couple of months after John Carman was arrested. So the district court severed the two cases for trial. Lane's been out on bond and there have been a number of continuances. Most of which were jointly requested by the defendant. So he hasn't been tried yet? No. He's set for trial in October, on October 27th. With that, I'm prepared to submit matters. All right. Thank you, counsel. United States v. Carman will be submitted. And this session of the court is adjourned for today. All rise. Thank you.
judges: Canby, Wardlaw, Callahan